Appeal Nos. 13-2178(L), 13-2182, 13-2183

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

M. C., A MINOR BY AND THROUGH HIS PARENTS PAMELA CRAWFORD AND JOHN MARK CRAWFORD, PARENTAL NATURAL GUARDIAN PAMELA CRAWFORD, PARENTAL NATURAL GUARDIAN JOHN MARK CRAWFORD,

*Plaintiff - Appellee,*
v.

DR. JAMES AMRHEIN; DR. IAN AARONSON; DR. YAW APPIAGYEI-DANKAH; KIM AYDLETTE; MEREDITH WILLIAMS; CANDICE DAVIS, A/K/A CANDI DAVIS; AND MARY SEARCY,

*Defendants - Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT CHARLESTON

_____

**RESPONSE BRIEF OF APPELLEE M.C.**

_____

Kristi L. Graunke
SOUTHERN POVERTY LAW CENTER
233 Peachtree St. NE, Suite 2150
Atlanta, GA 30303
T: (404) 521-6700
E: *kristi.graunke@splcenter.org*

Kenneth M. Suggs
JANET, JENNER AND SUGGS, LLC
500 Taylor Street, Suite 301
Columbia, SC 29201
T: (803) 726-0050
E: *ksuggs@myadvocates.com*

*Counsel for Appellee (Continued)*

Alesdair H. Ittelson
David Dinielli
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
T: (334) 956-8200
E: *alesdair.ittelson@splcenter.org*
E: *david.dinielli@splcenter.org*

Anne Tamar-Mattis
ADVOCATES FOR INFORMED CHOICE
P.O. Box 676
Cotati, CA 94931
T: (707) 793-1190
E: *director@aiclegal.org*

John Lovi
William Ellerbe
STEPTOE AND JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
T: (212) 506-3900
E: *jlovi@steptoe.com*
E: *wellerbe@steptoe.com*

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae  are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  13-2178L          Caption:  M.C. v. James Amrhein, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

M.C., a minor by and through his parents Pamela Crawford and John Mark Crawford
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐ YES ☑ NO


2.      Does party/amicus have any parent corporations?      ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐ YES ☑ NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(b))?      ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ Kristi L. Graunke_____      Date:_____April 2, 2014_____

Counsel for: _Appellee_____

# CERTIFICATE OF SERVICE
****************************

I certify that on_____April 2, 2014_____the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

J. Ben Alexander
Kenneth N. Shaw
HAYNSWORTH SINKLER BOYD, P.A.
Post Office Box 2048
Greenville, South Carolina  29602

Robert H. Hood
Barbara Wynn Showers
Deborah Harrison Sheffield, Of Counsel
HOOD LAW FIRM, LLC
172 Meeting St. Post Office Box 1508
Charleston, South Carolina 29402

Andrew F. Lindemann
William H. Davidson, II
DAVIDSON & LINDEMANN, P.A.
Post Office Box 8568
Columbia, South Carolina  29202

_/s/ Kristi L. Graunke_____      _____April 2, 2014_____
        (signature)                              (date)

Print     Save     Reset Form

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iv

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES ......................................................................2

STATEMENT OF THE CASE...................................................................3

    I.    Factual Background...................................................................3

        A. The Birth of M.C.................................................................3

        B.  The Department of Social Services Assumes Custody of M.C. ......4

        C.  Defendants Plan and Subject M.C. to a Medically Unnecessary Sex Assignment Surgery ...........................................5

               1.  Participation of Defendants Amrhein, Aaronson, and Appiagyei-Dankah ...............................................................5

               2.  Participation of Defendants Aydlette, Williams, Davis, and Searcy ................................................................9

        D.  M.C.'s Current Situation ...................................................10

    II.    Procedural Background.....................................................11

SUMMARY OF ARGUMENT ................................................................12

ARGUMENT .........................................................................................14

    I.    Standard of Review ..............................................................14

    II.    Defendants Violated M.C.'s Clearly Established Due Process Rights to Reproduction, Bodily Integrity, and Privacy When They Subjected Him to a Medically Unnecessary Surgery That Irrevocably Destroyed Male Fertility and Sexual Function................16

i

A. Defendants Knowingly Violated M.C.'s Clearly Established Right to Reproduction When They Unnecessarily Removed His Penis and Testicle and Thus Irrevocably Eliminated Any Male Reproductive Capacity ................................................. 18

    1. The Supreme Court and This Court Have Long Held That the Fourteenth Amendment Prohibits Unwarranted State Interference With an Individual's Reproductive Autonomy ..................................................... 18

    2. Relevant Precedent Clearly Establishes That M.C.'s Fourteenth Amendment Right To Make Decisions Related to Reproduction Is Not Limited to Treatment Resulting in Total Sterilization ........................................... 20

    3. Medical Standards of Care Are Subject to Factual Dispute and Do Not Supplant the Court's Role in Determining Whether Constitutional Rights Were Violated ....................................................... 23

B. Defendants' Authorization of an Irreversible and Medically Unnecessary Sex Assignment Surgery Violated M.C.'s Clearly Established Right to Bodily Integrity ............................... 27

C. Defendants Violated M.C.'s Clearly Established Right to Privacy in Relation to Adult Sexual Expression When They Subjected Him to a Medically Unnecessary Sex Assignment Surgery ...................................................... 30

D. M.C.'s Status as a Minor Does Not Negate His Clearly Established Rights of Procreation, Bodily Integrity, and Privacy and the SCDSS Defendants' Custody of M.C. Did Not Grant Them Rights Coextensive With Those of a Parent ....................................................... 33

    1. Minors Enjoy Significant and Clearly Established Constitutional Rights to Reproductive Autonomy and to Bodily Integrity and Privacy ...................................... 34

        2.   SCDSS Authority To Make Medical Decisions for
M.C. Did Not Authorize Violation of His
Constitutional Rights, Nor Is SCDSS' Authority To
Control the Bodies of Children in its Custody
Coextensive With That of a Parent......................................40

III.    Defendants Violated the Fourteenth Amendment's Procedural
Due Process Guarantees When They Performed a
Fertility-Destroying Sex Assignment Surgery Absent a Pre-
Deprivation Hearing Before a Neutral Fact Finder............................45

CONCLUSION ........................................................................54

REQUEST FOR ORAL ARGUMENT .................................................55

CERTIFICATE OF COMPLIANCE ...................................................56

CERTIFICATE OF SERVICE .........................................................57

# TABLE OF AUTHORITIES

## CASES

*Avery v. County of Burke,*
  660 F.2d 111 (4th Cir. 1981) ................................................................. passim

*Bellotti v. Baird,*
  443 U.S. 622 (1979) ............................................................... 34, 41

*Buck v. Bell,*
  274 U.S. 200 (1927) ....................................................... 14, 47, 48, 49

*C.D.M. v. State,*
  627 P.2d 607 (Alaska 1981) ................................................48

*Cameron v. Tomes,*
  990 F.2d 14 (1st Cir. 1993) ........................................... 24–25

*Carey v. Population Services, International,*
  431 U.S. 678 (1977) ............................................... 19, 22, 46

*Conservatorship of Valerie N. v. Valerie N.,*
  707 P.2d 760 (Cal. 1985)................................................48

*Cox v. Stanton,*
  529 F.2d 47 (4th Cir. 1975) ....................................... 19, 25

*Cruzan v. Director, Mo. Department of Health,*
  497 U.S. 261 (1990) ...........................................................17

*De'lonta v. Johnson,*
  708 F.3d 520 (4th Cir. 2013)............................................24

*Doe ex rel. Johnson v. S.C. Department of Social Services,*
  597 F.3d 163 (4th Cir. 2010)............................................16

*Doe v. Renfrow,*
  631 F.2d 91 (7th Cir. 1980) .............................................35

*Downs v. Sawtelle,*
    574 F.2d 1 (1st Cir. 1978) ........................................................................ 20, 53

*Dubbs v. Head Start, Inc.,*
    336 F.3d 1194 (10th Cir. 2003) ........................................................................35

*Edwards v. City of Goldsboro,*
    178 F.3d 231 (4th Cir. 1999) ........................................................................26

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
    637 F.3d 435 (4th Cir. 2011) ........................................................................21

*Eisenstadt v. Baird,*
    405 U.S. 438 (1972) ........................................................................ 21, 22, 23

*Frazier v. Levi,*
    440 S.W.2d 393 (Tex. Civ. App. 1969) ........................................................................49

*Gregg v. Ham,*
    678 F.3d 333 (4th Cir. 2012) ........................................................................11

*Griswold v. Connecticut,*
    381 U.S. 479 (1965) ........................................................................23

*H. L. v. Matheson,*
    450 U.S. 398 (1981) ........................................................................42

*Hall v. Tawney,*
    621 F.2d 607 (4th Cir. 1980) ........................................................................35

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ........................................................................15

*Henry v. Purnell,*
    652 F.3d 524 (4th Cir. 2011) ........................................................................ 16, 39

*Holmes v. Powers,*
    439 S.W.2d 579 (Ky. Ct. App. 1968)........................................................................49

*Hope v. Pelzer,*
 536 U.S. 730 (2002) ................................................................15

*IGEN International, Inc. v. Roche Diagnostics GmbH,*
 335 F.3d 303 (4th Cir. 2003) ................................................ 11–12

*In re A.W.,*
 637 P.2d 366 (Colo. 1981) .......................................................48

*In re Debra B.,*
 495 A.2d 781 (Me. 1985) ..........................................................49

*In re Estate of K.E.J.,*
 887 N.E.2d 704 (Ill. App. 2008)..........................................48–49

*In re Grady,*
 426 A.2d 467 (N.J. 1981) ..........................................................49

*In re Hayes,*
 608 P.2d 635 (Wash. 1980) .......................................................49

*In re Hillstrom,*
 363 N.W.2d 871 (Minn. Ct. App. 1985) ..................................49

*In re M.K.R.,*
 515 S.W.2d 467 (Mo. 1974) ......................................................49

*In re Moe,*
 432 N.E.2d 712 (Mass. 1982).....................................................49

*In re Moore,*
 221 S.E.2d 307 (N.C. 1976) ......................................................49

*In re Opinion of the Justices*,
 162 So. 123 (Ala. 1935) ............................................................48

*In re Penny N.,*
 414 A.2d 541 (N.H. 1980).........................................................49

*In re Terwilliger,*
    450 A.2d 1376 (Pa. Super. Ct. 1982) ...................................................49

*Jordan ex rel. Jordan v. Jackson,*
    15 F.3d 333 (4th Cir. 1994) ...........................................................42

*Lake v. Arnold,*
    112 F.3d 682 (3d Cir. 1997) ...........................................................20

*Lake v. Arnold,*
    232 F.3d 360 (3d Cir. 2000) ...................................................... 42, 53

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ................................................................ passim

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ....................................................... 14, 46, 49

*Melgar ex rel. Melgar v. Greene,*
    593 F.3d 348 (4th Cir. 2010) ...........................................................14

*Meyers v. Baltimore Cnty., Md.,*
    713 F.3d 723 (4th Cir. 2013) ...........................................................14

*Missouri v. McNeely,*
    133 S.Ct. 1552 (2013)....................................................................29

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ........................................................................1

*Morrissey v. Brewer,*
    408 U.S. 471 (1972) ................................................................ 46, 50

*Motes v. Hall Cnty. Department of Family & Children Services,*
    306 S.E.2d 260 (Ga. 1983) ..............................................................48

*N.C. Association for Retarded Children v. State of N.C.,*
    420 F. Supp. 451 (M.D.N.C. 1976)..................................................53

*Parham v. J.R.*,
442 U.S. 584 (1979) ................................................................ passim

*Pearson v. Callahan*,
555 U.S. 223 (2009) ...................................................................16

*PJ ex rel. Jenson v. Wagner*,
603 F.3d 1182 (10th Cir. 2010) .............................................. 36–37

*Planned Parenthood of Central Mo. v. Danforth*,
428 U.S. 52 (1976) ................................................................. passim

*Planned Parenthood of Se. Pa. v. Casey*,
505 U.S. 833 (1992) ............................................................... passim

*Prince v. Massachusetts*,
321 U.S. 158 (1944) ...................................................................41

*Reliable Consultants, Inc. v. Earle*,
517 F.3d 738 (5th Cir. 2008) ......................................................32

*Rochin v. California*,
342 U.S. 165 (1952) ............................................................. 13, 28

*Roe v. Elyea*,
631 F.3d 843 (7th Cir. 2011) .......................................................24

*Roe v. Tex. Department of Protective and Regulatory Services*,
299 F.3d 395 (5th Cir. 2002) .......................................................35

*Sell v. United States*,
539 U.S. 166 (2003) ............................................................. 28–29

*Shafer v. Preston Memorial Hospital Corp.*,
107 F.3d 274 (4th Cir. 1997) .......................................................27

*Skinner v. Okla. ex rel. Williamson*,
316 U.S. 535 (1942) .............................................................. passim

*State v. Brown,*
   326 S.E.2d 410 (S.C. 1985) ........................................................ 29–30

*Smith v. Org. of Foster Families for Equal. & Reform,*
   431 U.S. 816 (1972) ........................................................................41

*Tenenbaum v. Williams,*
   193 F.3d 581 (2d Cir. 1999) ...........................................................35

*Union Pacific Railway Co. v. Botsford,*
   141 U.S. 250 (1891) ........................................................................27

*United States v. Charters,*
   863 F.2d 302 (4th Cir. 1988) ..........................................................52

*Vaughn v. Ruoff,*
   253 F.3d 1124 (8th Cir. 2001) ............................................... passim

*Vitek v. Jones,*
   445 U.S. 480 (1980) ............................................................... 24, 51

*Washington v. Glucksberg,*
   521 U.S. 702 (1997) ............................................................... 17, 46

*Washington v. Harper,*
   494 U.S. 210 (1990) ........................................................................52

*Webster v. Reproductive Health Services,*
   492 U.S. 490 (1989) ........................................................................21

*Wentzel v. Montgomery General Hospital, Inc.,*
   447 A.2d 1244 (Md. 1982) .............................................................49

*Williams v. Smith,*
   131 N.E. 2 (Ind. 1921) ....................................................................49

*Wilson v. Kittoe,*
   337 F.3d 392 (4th Cir. 2003) ..........................................................15

*Winston v. Lee,*
   470 U.S. 753 (1985) ............................................................ 13, 28–29, 30

*Wirsing ex rel. Wirsing v. Mich. Protection & Advocacy Service,*
   573 N.W.2d 51 (Mich. 1998) .............................................................49

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) .............................................................41

## STATUTORY AUTHORITIES

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

42 U.S.C. § 1983 ................................................................... 1, 11, 42

42 U.S.C. § 1985 .........................................................................42

Alaska Stat. Ann. § 13.26.150 (West 2013) .............................................49

Conn. Gen. Stat. Ann. § 45a-691 (West 2014) .......................................48

Fla. Stat. Ann. § 744.3215 (West 2013).................................................48

Ga. Code Ann. § 31-20-3 (West 2013) ..................................................48

Idaho Code Ann. § 39-3903 (West 2014) ...............................................48

Me. Rev. Stat. Ann. tit. 34-B, § 7004 (West 2009) ................................48

N.C. Gen. Stat. Ann. § 35A-1245 (West 2013) .....................................48

N.D. Cent. Code Ann. § 23-12-13 (West 2013) .....................................48

Nev. Rev. Stat. Ann. § 159.0805 (West 2013) ......................................48

Okla. Stat. Ann. tit. 10A, § 1-3-103 (West 2013).................................48

R.I. Gen. Laws Ann. § 11-9-17 (West 2013) .........................................49

x

Utah Code Ann. § 62A-6-102 (West 2013)...............................................48

Va. Code Ann. § 54.1-2975 (West 2013)..............................................48

## OTHER AUTHORITIES

Anne Tamar-Mattis, *Exceptions to the Rule: Curing the Law's Failure to Protect Intersex Infants*, 21 BERKELEY J. GENDER L. & JUST. 59 (2006) ...........26

Elizabeth S. Scott, *Sterilization of Mentally Retarded Persons: Reproductive Rights and Family Privacy*, 1986 DUKE L.J. 806 (1986)...............25

## JURISDICTIONAL STATEMENT

Plaintiff-Appellee M.C. alleges violations of his constitutional rights under 42 U.S.C. § 1983, over which the District Court had jurisdiction pursuant to 28 U.S.C. § 1331.  All Defendants-Appellants timely filed notices appealing the District Court's August 29, 2013 order denying their qualified immunity-based motions to dismiss.  This Court has jurisdiction under 28 U.S.C. § 1291 to review the District Court's order insofar as the order denies qualified immunity to the Defendants-Appellants.  *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

## STATEMENT OF ISSUES

1.      Based on the allegations of Plaintiff-Appellee's Complaint, did Defendants-Appellants violate Plaintiff-Appellee's clearly established Fourteenth Amendment right to procreation when, absent any state interest, they subjected him to a medically unnecessary sex assignment surgery in which the sixteen-month-old Plaintiff-Appellee was castrated, had his penis removed, and had his genitals refashioned to appear female, thereby irrevocably destroying all male reproductive and sexual function?

2.      Did Defendants-Appellants violate Plaintiff-Appellee's clearly established Fourteenth Amendment right to bodily integrity when they subjected him to the sex assignment surgery as alleged in the Complaint?

3.      Did Defendants-Appellants violate Plaintiff-Appellee's clearly established Fourteenth Amendment right to privacy when they subjected him to the sex assignment surgery as alleged in the Complaint?

4.      Did Defendants-Appellants violate Plaintiff-Appellee's clearly established Fourteenth Amendment procedural due process rights when, as alleged in the Complaint, Defendants subjected him to the sex assignment surgery without first seeking a hearing before a neutral fact finder?

## STATEMENT OF THE CASE

### I.      Factual Background

This case arises from a medically unnecessary sex assignment surgery performed by state hospital physicians on Plaintiff-Appellee M.C. (hereinafter "M.C.") when he was a sixteen-month-old foster child in the care and custody of the South Carolina Department of Social Services (hereinafter "SCDSS"). The relevant factual allegations summarized in this section are taken from M.C.'s Complaint.

### A.     The Birth of M.C.

M.C. was born in November of 2004 in Greenville, South Carolina. Joint Appendix (hereinafter "JA") 13, ¶ 16. He was born with a condition known as ovotesticular Difference/Disorder of Sex Development (DSD), a condition sometimes referred to as "true hermaphroditism." JA 21, ¶ 40. Ovotesticular DSD is characterized by the presence of both testicular and ovarian tissue. JA 21, ¶ 40. An estimated one in 2,000 babies is born with reproductive or sexual anatomy that does not fit typical definitions of male or female. JA 18, ¶ 31. Such conditions, sometimes grouped under the categories of DSD or "intersex," have an incidence higher than Down syndrome or cystic fibrosis. JA 18, ¶ 31.

M.C. was first identified in the hospital records as male. JA 21, ¶ 41. Medical personnel noted that he had a testicle, an ovotestis (a gonad with both

3

ovarian and testicular tissue) and a "rather large phallus" along with other genital structures. JA 21, ¶ 41. Blood tests performed on the newborn M.C. indicated that he had "extremely elevated" testosterone levels, and medical records remarked on his "significant" penis and "scrotalized" labia. JA 21, ¶ 41.

B.    The Department of Social Services Assumes Custody of M.C.

SCDSS began an investigation into possible neglect by M.C.'s biological parents shortly after M.C. was born. JA 20, ¶ 36. According to a December 2004 SCDSS report, M.C.'s biological mother rarely visited him in the hospital and it was difficult to reach her to obtain consent for medical procedures. JA 20, ¶ 36. SCDSS officials believed that both of M.C.'s biological parents posed a substantial risk of physically neglecting M.C. JA 20, ¶ 36.

One week after M.C. was released from the hospital in February 2005, his biological parents notified SCDSS that they wanted to relinquish their parental rights. JA 20, ¶ 37. Pursuant to an *ex parte* county court order, SCDSS took custody of M.C. on February 16, 2005 because the biological mother "was distraught and unable to care for the child." JA 20, ¶ 38;[1] JA 179 ¶ 1. About six

---

[1] Defendant-Appellant James Amrhein inaccurately contends that the date of the county court *ex parte* custody order was March 10, 2005. Amrhein Br. at 3 n.2. The March 10 order referenced by Amrhein, however, was the second custody order entered in M.C.'s case and was entered following a hearing. *See generally* JA 179, ¶ 1 (order finding probable cause for SCDSS to "retain custody" and also for the prior *ex parte* order). Whether the *ex parte* order was entered on February 16, 2005 or March 10, 2005, however, the asserted difference in dates is irrelevant

months after SCDSS first took custody of M.C., SCDSS filed a termination of parental rights complaint. JA 20, ¶ 38. M.C.'s biological parents' rights were terminated by a court on September 9, 2006. JA 20, ¶ 38. From February 2005, when SCDSS first took custody of M.C. to December 11, 2006, the date when he was adopted, SCDSS retained legal custody of M.C. and retained the authority to make medical decisions for him. JA 20–21, ¶ 39.

C.    Defendants Plan and Subject M.C. to a Medically Unnecessary Sex Assignment Surgery

1.    *Participation of Defendants Amrhein, Aaronson, and Appiagyei-Dankah*

Defendant-Appellant Dr. James Amrhein (hereinafter "Defendant Amrhein"), a pediatric endocrinologist and employee of Greenville Hospital System who had become involved in M.C.'s case by February 2005, wrote a letter to M.C.'s pediatrician on October 5, 2005 describing M.C.'s DSD as "confusing," and noting a "well-developed phallus" and "scrotalized labia," as well as "extremely elevated" testosterone levels. JA 14–15, 22, ¶¶ 19, 43. On October 11, 2005, another doctor performed exploratory surgery on M.C. JA 22, ¶ 44. Following the surgery, Defendant Amrhein wrote to M.C.'s pediatrician and opined that M.C. was "a true hermaphrodite." JA 22–23, ¶ 45. Amrhein further

---

to this appeal, because under either scenario M.C. was in SCDSS custody when the key decisions about the sex assignment surgery were made. *See generally* JA 20-25, ¶¶ 39-51.

stated that decisions needed to be made regarding the gender according to which M.C. should be raised and whether M.C. should undergo a "surgical correction." JA 22–23, ¶ 45.

Standard medical practice is that a child born with DSD be raised in conformity with the gender believed most likely to match the child's future gender identity. JA 19, ¶ 32. But this assignment, commonly referred to as a "gender of rearing," is typically regarded as provisional and subject to change if the child's later-developing gender identity does not match the assignment. JA 19, ¶ 32.

Surgical alteration of the genitals and sex organs of infants born with intersex conditions, or sex assignment surgery, by contrast, is permanent. JA 19, ¶ 33. Such surgeries carry severe risks, including the elimination or reduction of reproductive capacity and the potential that the assigned sex will be misaligned with the child's later-developed gender. JA 19, 24–25, ¶¶ 33, 50. Such surgery also carries significant risk of decreased future sexual function. JA 19, 24–25, ¶¶ 33, 50. Indeed, Defendant-Appellant Dr. Ian Aaronson (hereinafter "Defendant Aaronson"), who performed the actual sex assignment surgery on M.C., published an article in 2001 in which he recognized that "carrying out a feminizing genitoplasty on an infant who might eventually identify herself as a boy would be catastrophic." JA 23–25, ¶¶ 47, 51.

6

Modern standards of care recognize that a child with an intersex condition can be raised as a boy or a girl without early sex assignment surgery. JA 19, ¶ 33. Such surgeries may be postponed until the child knows what gender he or she is and can participate in deciding whether to undergo a procedure that risks infertility and elimination of sexual function and sensation. JA 19, ¶ 33. Because of these life-altering risks, doctors typically suggest that even adults seeking sex assignment surgery undergo psychotherapy beforehand in order to prepare for this life-altering step. JA 19, ¶ 32.

Despite the severe and well-known risks of performing a sex assignment surgery on a young child, Defendant Amrhein decided that M.C. needed "surgical correction" and called on two Medical University of South Carolina ("MUSC") doctors, Defendant Aaronson, a pediatric urologist, and Defendant-Appellant Dr. Yaw Appiagyei-Dankah (hereinafter "Defendant Appiagyei-Dankah"), a pediatric endocrinologist, to execute the surgery. JA 14–15, 22–25, ¶¶ 18–20, 45–50. Medical records indicate the defendant doctors were aware that there was "no compelling reason that [M.C.] should be either male or female—the decision was made to raise her as female." JA 23, ¶ 46(e). Despite this, Defendants Appiagyei-Dankah, Aaronson, and Amrhein urged SCDSS officials in charge of M.C.'s care to authorize the sex assignment surgery they proposed. JA 23–25, ¶¶ 46–50.

7

Defendants Amrhein, Appiagyei-Dankah, and Aaronson collaborated with SCDSS officials to plan and on April 28, 2006 perform an elective sex assignment surgery that removed M.C.'s penis, testicle, and additional testicular tissue from his other gonad, in addition to surgically refashioning his genitals to appear female. JA 22–25, ¶¶ 45-51.  All three doctors knew that the sex assignment surgery was irreversible and posed severe risks, including destruction of male fertility and sexual function, scarring, gender misalignment, and lifetime psychological distress. JA 24–25, ¶ 50.  All three doctors knew that M.C. could be assigned a gender of rearing without being subjected to early sex assignment surgery, and that the sex assignment surgery was not medically necessary, was painful and invasive, and could be postponed until M.C. was old enough to make a decision for himself regarding which, if any, genital surgical interventions he desired.  JA 12, 19 ¶¶ 8, 33, 52.

All three doctors knew the substantial risk that M.C.'s gender identity would not align with the female sex assignment chosen by them because M.C.'s high levels of prenatal testosterone exposure had likely affected his gender identity.  JA 23–25, ¶¶ 46–50.  Moreover, the doctors also knew that they could not accurately predict whether M.C. would ultimately develop a male or female gender identity. JA 23–24, ¶¶ 46–48.

Defendants Amrhein, Appiagyei-Dankah, and Aaronson knew that the proposed treatment plan for M.C. was a sex assignment surgery which involved surgical castration and removal of the penis, which would result in irreversible destruction of male reproductive capacity and sexual function. JA 24–25, ¶¶ 49, 50. They knew that M.C. was in SCDSS custody and that SCDSS was in charge of making medical decisions for M.C., yet at no time did they take any steps to obtain an ethics consultation or to initiate or request a pre-surgery hearing of any kind to determine if the sex assignment surgery was in M.C.'s best interest. JA 22–23, 25-26, 31-32, ¶¶ 45–46, 54, 59, 80.

2. *Participation of Defendants Aydlette, Williams, Davis, and Searcy*

Various SCDSS caseworkers were responsible for M.C.'s care during the time period in which the decision to perform sex assignment surgery on M.C. was made and executed. JA 16, 26–27, ¶¶ 22–24, 56–60. Defendant-Appellant Meredith Williams (hereinafter "Defendant Williams"), an SCDSS caseworker, was responsible for the oversight of M.C.'s case, including his safety and well-being while he was in state custody. JA 16, ¶ 22. She attended various appointments with M.C.'s doctors and participated in making and carrying out the treatment plan for M.C.'s sex assignment surgery, including providing the necessary SCDSS authorization forms to the SCDSS Director Defendant-Appellant Kim Aydlette (hereinafter "Defendant Aydlette"). JA 16, 26, ¶¶ 22, 56, 57.

9

Among other steps taken by Defendant SCDSS employees to arrange and facilitate M.C.'s sex assignment surgery, Defendant Williams, the employee supervising M.C.'s case, and Defendant-Appellant Candi Davis (hereinafter "Defendant Davis"), his adoption caseworker, instructed M.C.'s foster mother to physically deliver him to the hospital to undergo the sex assignment surgery.  JA 26, ¶ 58.  Defendant Aydlette, in her capacity as SCDSS director, provided the necessary written SCDSS authorization for M.C.'s "surgical correction."  JA 27–28, ¶ 61.  Defendant Aaronson obtained final oral authorization to proceed with the sex assignment surgery from SCDSS employee Defendant-Appellant Mary Searcy (hereinafter "Defendant Searcy") via telephone.  JA 26, ¶ 59.

Defendants Aydlette, Williams, Davis, and Searcy knew that the sex assignment surgery would remove M.C.'s penis and testicle and destroy M.C.'s ability to ever procreate as male.  JA 27, ¶ 60.  Despite knowing the fertility-destroying and life-altering nature of the proposed surgery, none of these Defendants requested or initiated a pre-surgery hearing before a neutral fact finder to determine if the sex assignment surgery was in M.C.'s best interest.  JA 27, 32–33, ¶¶ 60, 84, 87.

D.    M.C.'s Current Situation

In June 2006, two months after undergoing the sex assignment surgery, M.C. was placed in the custody of Pamela and Mark Crawford, who legally adopted him

10

in December 2006.  JA 28, ¶ 64.  The Crawfords originally raised M.C. as a girl in

accordance with the gender of rearing assigned by Defendants.  JA 28, ¶ 65.  M.C.,

however, has retained a strong sense of male identity from an early age and

identifies as a boy.  JA 28, ¶ 65.  M.C. is now living as a boy with the support of

his family, friends, school, pediatrician, and religious leaders.  JA 28, ¶ 65.

## II.    Procedural Background

M.C., by and through the Crawfords, filed the underlying action in the

United States District Court for District of South Carolina on May 14, 2013,

alleging that Defendants' actions in subjecting him to a medically unnecessary and

castrating sex assignment surgery violated his Fourteenth Amendment rights.  JA

10–35.  In response, Defendants filed motions to dismiss, asserting qualified

immunity defenses.  JA 36–72. [2]

---

[2] Defendant Amrhein initially moved to dismiss based primarily on the argument
that he was not a state actor within the reach of 42 U.S.C. § 1983.  *See* JA 69–72,
183–86, 256–64.  The District Court denied all of the motions to dismiss on the
basis that none of the Defendants was entitled to qualified immunity and did not
address Amrhein's state actor argument.  JA 247.  On appeal, Amrhein contends
that this Court lacks jurisdiction to review the District Court's "apparent holding"
that he is a state actor but he also "fully incorporates herein the arguments set
forth" in his District Court briefing.  Amrhein Br. at 2 n.1.  Notably, if Amrhein is
not a state actor, he may not be entitled to qualified immunity.  *See, e.g.*, *Gregg v.
Ham*, 678 F.3d 333, 339-40 (4th Cir. 2012) (private bail bondsmen acting under color
of state law could not avail themselves of qualified immunity).  Even if the District
Court's apparent rejection of Amrhein's state actor argument were appealable at
this stage, Amrhein has waived any ability to raise this issue in the current appeal
by failing to do anything beyond incorporating his district court briefing by
reference via a single footnote.  *See IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,

The District Court heard argument on the motions on August 22, 2013 and denied all Defendants' motions in a summary oral ruling from the bench.  JA 299.  On August 29, 2013, the District Court issued a written order holding that qualified immunity could not be invoked by Defendants at this stage because M.C. had sufficiently articulated that Defendants violated his clearly established Fourteenth Amendment rights to procreation and to a pre-deprivation hearing before implementing the surgery in question.  JA 242–48.  Defendants filed timely notices of appeal to this Court.  JA 303–07.

## SUMMARY OF ARGUMENT

The District Court correctly held that Defendants are not entitled to qualified immunity based on the allegations of M.C.'s Complaint, even though this may be the first constitutional case involving sex-assignment surgery performed on a sixteen-month-old child.  The Constitution protects a child born with an intersex condition just as it does any other child.  M.C. has the same Fourteenth Amendment rights as any other person to procreation, bodily integrity, and privacy.  The fact that he was born with atypical genitals does not diminish those rights.  By enacting the decision to perform a medically unnecessary, irreversible,

---

335 F.3d 303, 309 n.3 (4th Cir. 2003) (cursory references to an issue in an opening brief footnote and in a reply brief were insufficient to preserve issue for appellate review).

and fertility-destroying sex assignment surgery on M.C absent any compelling state interest, Defendants violated M.C.'s clearly established due process rights under the Fourteenth Amendment in at least four ways.

- *First*, as the District Court correctly held, M.C.'s assertions that Defendants subjected him to a medically unnecessary sex assignment surgery that permanently destroyed any male reproductive capacity suffice to allege that Defendants violated his clearly established substantive due process right to procreation. *See generally Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992); *Skinner v. Okla. ex rel. Williamson*, 316 U.S. 535, 541 (1942); *Avery v. Cnty. of Burke*, 660 F.2d 111, 115 (4th Cir. 1981).

- *Second*, the sex assignment surgery alleged by M.C. constituted an egregious, irreversible, risky, and painful violation of M.C.'s clearly established substantive due process right to bodily integrity, which includes a right to be free from medically unnecessary surgical intrusions compelled by the state. *See generally Winston v. Lee*, 470 U.S. 753, 760 (1985); *Rochin v. California,* 342 U.S. 165, 172 (1952).

- *Third*, the sex assignment surgery irreversibly altered M.C.'s genitals, severely compromising his future sexual function and permanently interfering with his clearly established substantive due process right to

13

privacy and liberty in matters relating to adult sexual intimacy. *See generally Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *Casey*, 505 U.S. at 851.

- *Fourth*, the District Court correctly held that M.C. sufficiently alleged that Defendants violated his clearly established right to procedural due process by failing to seek a pre-surgery hearing before a neutral fact finder to determine whether the sex assignment surgery was in M.C.'s best interest. *See generally Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *Buck v. Bell*, 274 U.S. 200, 206–07 (1927).

## ARGUMENT

### I.    Standard of Review

This Court reviews a District Court's denial of a qualified immunity-based motion to dismiss *de novo*, accepting as true the facts alleged in the complaint and viewing them in the light most favorable to the plaintiff. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Defendants carry the burden of proof and persuasion to establish their asserted entitlement to qualified immunity. *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013).

In determining whether qualified immunity applies, the salient inquiry is whether the law existing at the time of the conduct alleged provided Defendants

with fair warning that, by subjecting M.C. to a medically unnecessary surgery that

destroyed all male reproductive and sexual function, they were violating his

constitutional rights. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Harlow v.*

*Fitzgerald*, 457 U.S. 800, 819 (1982) ("Where an official could be expected to

know that certain conduct would violate statutory or constitutional rights, he

should be made to hesitate; and a person who suffers injury caused by such

conduct may have a cause of action."). In this analysis, the lack of factually

identical or even "fundamentally" or "materially" similar case law does not

automatically shield Defendants from accountability:

> [G]eneral statements of the law are not inherently incapable of giving
> fair and clear warning, and in other instances a general constitutional
> rule already identified in the decisional law may apply with obvious
> clarity to the specific conduct in question, even though the very action
> in question has [not] previously been held unlawful . . . . [O]fficials
> can still be on notice that their conduct violates established law *even*
> *in novel factual circumstances.*

 *Hope*, 536 U.S. at 741 (emphasis added, internal citations and quotations

omitted); *see also Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003)

("[Q]ualified immunity was never intended to relieve government officials

from the responsibility of applying familiar legal principles to new

situations.") (internal quotations and citations omitted). Moreover, qualified

immunity does not shield "even well intentioned" state officials who make

15

unreasonable legal mistakes regarding the constitutionality of their conduct.
*Henry v. Purnell*, 652 F.3d 524, 535 (4th Cir. 2011) (en banc).

The qualified immunity analysis generally proceeds according to two sequential steps. First, the court may look at whether the facts as alleged by the plaintiff show that a state official has violated his constitutional or statutory rights. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the court determines that the facts alleged show that an official violated a right, the second step requires that it examine whether the right was clearly established at the time of the alleged violation. *Id.* at 232. Although the sequential analysis is not mandatory, "it is often beneficial . . . . [T]he two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* at 236 (citation omitted); *see also Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010) (following sequence where the case involved an "important issue" and doing so "will clarify and elaborate upon our prior jurisprudence in important and necessary ways").

## II. Defendants Violated M.C.'s Clearly Established Due Process Rights to Reproduction, Bodily Integrity, and Privacy When They Subjected Him to a Medically Unnecessary Surgery That Irrevocably Destroyed Male Fertility and Sexual Function

The Fourteenth Amendment's guarantee that no state "shall deprive any person of life, liberty, or property, without due process of law" has long been

understood to have a substantive component that bars "certain government actions regardless of the fairness of the procedures used to implement them." *Casey*, 505 U.S. at 846. The Fourteenth Amendment protects certain basic liberties from government intrusion, including the rights to privacy, decisions about marriage and family, sexuality and intimate relationships, reproduction, and bodily integrity. *Lawrence*, 539 U.S. at 573–74; *Casey*, 505 U.S. at 849. These substantial individual liberty interests are weighed against the relevant state interests to determine if the individual's constitutional rights have been violated. *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990). Where fundamental rights such as reproductive decision-making and bodily integrity are involved, however, the state interest must be compelling and the intrusion on such rights narrowly tailored. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("[T]he Fourteenth Amendment forbids the government to infringe fundamental liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (internal quotations and ellipses omitted).

As detailed below, under pre-2006 Supreme Court and Fourth Circuit precedent, M.C. had substantial and well-established interests in reproduction, bodily integrity, and privacy. Defendants advance no compelling state interest in surgically castrating and irreversibly altering the reproductive anatomy of a

17

sixteen-month-old child for the medically unnecessary purpose of creating female-appearing genitals.

    A.    <u>Defendants Knowingly Violated M.C.'s Clearly Established Right to Reproduction When They Unnecessarily Removed His Penis and Testicle and Thus Irrevocably Eliminated Any Male Reproductive Capacity</u>

    1.    *The Supreme Court and This Court Have Long Held That the Fourteenth Amendment Prohibits Unwarranted State Interference With an Individual's Reproductive Autonomy*

The District Court correctly concluded that M.C.'s Fourteenth Amendment claim falls well within the contours of longstanding precedent forbidding involuntary and medically unnecessary sterilization of individuals by state officials absent compelling interest. JA 244. Contrary to Defendants' arguments, M.C.'s intersex condition does not remove his reproductive rights from the clear purview of this precedent, nor would it have shielded those involved from the knowledge that surgically removing his testicle and penis would destroy reproductive function.

At the time Defendants participated in the decision to surgically castrate M.C., over sixty years had elapsed since the Supreme Court first recognized that medically unnecessary sterilization intrudes on a profound liberty interest. *Skinner v. Okla. ex rel. Williamson*, 316 U.S. 535, 541 (1942) ("The power to sterilize, if exercised, may have subtle, far-reaching and devastating effects . . . . [the sterilized individual] is forever deprived of a basic liberty."). Indeed, the Supreme Court has held that the decision whether to reproduce lies at the very center of the "cluster of

18

constitutionally protected choices." *Carey v. Population Servs., Int'l*, 431 U.S. 678, 685 (1977). The Supreme Court has long described the constitutionally-protected right to reproduce as the right to be "free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Casey*, 505 U.S. at 851.

Over thirty years before Defendants participated in the decision to remove M.C.'s penis and testicle absent any medical necessity or compelling state interest, this Court interpreted *Skinner* to hold that "averments that the defendants permanently deprived [a plaintiff] of the ability to bear children allege the denial of a civil right." *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975). This Court further clarified the rights of individuals, including minors, to be free from state-imposed sterilization in *Avery v. Cnty. of Burke*. 660 F.2d 111 (4th Cir. 1981). In *Avery*, this Court reversed and remanded a district court's grant of summary judgment for a North Carolina county's board of health and board of social services after a fifteen-year-old girl brought suit following her medically unnecessary surgical sterilization. *Id.* Citing *Skinner*, this Court determined that the county's health and social services boards could be held liable under the Fourteenth Amendment for causing the plaintiff to be sterilized if their actions in urging and facilitating the sterilization "rose to the level of deliberate indifference to Avery's right of procreation or constituted tacit authorization of her sterilization." *Id.* at 114.

19

Over the decades, other circuits have similarly held that medically unnecessary destruction of reproductive capacity by state actors violates due process. *See, e.g.*, *Vaughn v. Ruoff*, 253 F.3d 1124, 1128-29 (8th Cir. 2001) (denying qualified immunity to a social worker who encouraged a medically-unnecessary sterilization); *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997) (*Lake I*") (intellectually disabled plaintiff's allegations that her parents, doctors, and hospital conspired to sterilize her without her informed consent when she was sixteen years old stated a violation of her constitutional rights); *Downs v. Sawtelle*, 574 F.2d 1, 11 (1st Cir. 1978) (denying qualified immunity to a doctor who sterilized an individual with parental consent but without pursuing a court order). In M.C.'s case, removing a healthy penis and testicle absent any medical necessity or compelling state interest clearly constitutes—at minimum—deliberate indifference to his right of procreation. *Avery*, 660 F.2d at 114.

2.    *Relevant Precedent Clearly Establishes That M.C.'s Fourteenth Amendment Right To Make Decisions Related to Reproduction Is Not Limited to Treatment Resulting in Total Sterilization*

In his brief, Defendant Amrhein contends that because M.C. does not definitively state that the removal of his penis and testicle completely sterilized him, M.C.'s right to procreation was not violated. Amrhein Br. at 17.[3] But

---

[3] In their briefs, Defendants improperly attempt to introduce several factual allegations that fall outside or contradict the Complaint, including: that M.C. may theoretically retain some female fertility; that authorization allegedly provided by

Amrhein's argument ignores that the Supreme Court has consistently characterized the individual's right to reproduce as the right to *decide* whether to reproduce. As clearly established by the Supreme Court since at least 1972, the right at issue is the right to be "free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the *decision* whether to *bear or beget* a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (emphasis added); *see also Casey*, 505 U.S. at 851 (quoting same language); *Webster v. Reprod. Health Servs.*, 492 U.S. 490 at 565 (1989) (using same language). Under *Eisenstadt* and related precedent, the particularized right to *decide* whether to bear (traditionally associated with female reproduction) *or* beget (traditionally associated with male reproduction) a child is equally protected by the Constitution. By irrevocably removing all of M.C.'s male reproductive structures, Defendants—at minimum—stripped M.C. of his ability to make a future decision about whether to beget a child. This alone states a clear violation of M.C.'s Fourteenth Amendment rights.

---

M.C.'s biological mother and SCDSS officials constituted "informed consent" for the sex assignment surgery; and that the treatment provided by the defendant doctors met the relevant standard of care. *See*, *e.g.*, Amrhein Br. at 4–5, 8, 11–12, 17; Aaronson and Appiagyei-Dankah Br. at 2, 3, 5, 11, 15, 18. Defendant Amrhein also specifically asserts—in direct conflict with the Complaint—that he had no responsibility for the decision to perform the sex assignment surgery. *See* Amrhein Br. at 5. In a motion to dismiss posture, Defendants are not entitled to introduce factual allegations not plead in the complaint. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011). Moreover, M.C. contests these assertions, all of which implicate disputed questions of fact that cannot be resolved without discovery.

21

Additionally, as the District Court correctly observed, M.C. has alleged numerous facts suggesting that M.C.'s potential for female reproduction was highly questionable and thus removal of M.C.'s penis and testicle risked total sterilization. *See* JA 244. Exploratory surgery conducted prior to the sex assignment surgery had revealed minimal female reproductive structures. JA 21–22, ¶¶ 42–44. Even for children born without intersex conditions, an individual's capacity to reproduce is typically not known until puberty, and may be uncertain regardless. Despite the inherent uncertainty of all humans' ability to reproduce when they might elect to do so, the Supreme Court has consistently protected an individual's right to decide to exercise his potential capacity to reproduce. *See, e.g.*, *Carey*, 431 U.S. 678 (law that restricted sale and advertisement of contraceptive devices was unconstitutional); *Eisenstadt*, 405 U.S. 438 (striking down law restricting unmarried persons' access to contraceptive devices).

Moreover, the Supreme Court has repeatedly held that state action that substantially interferes with an individual's reproductive decision-making but falls short of permanent sterilization violates the Fourteenth Amendment. *See Carey*, 431 U.S. 678 (restrictions on sale and advertisement of contraceptive devices); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52 (1976) (state law prohibiting use of early abortion procedure and requiring spousal consent for an abortion and parental consent for unmarried minors to obtain an abortion);

22

*Eisenstadt*, 405 U.S. 438 (law restricting unmarried persons' access to contraception); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (law restricting married persons' access to contraception). In subjecting M.C. to the sex assignment surgery, Defendants knew, at minimum, that by destroying all male reproductive capacity they might sterilize him completely without any medical need or any other compelling reason to do so. JA 24–25, 27–28, ¶¶ 50, 60–61. Their decision to proceed with the surgery despite such knowledge epitomizes "deliberate indifference to [M.C.'s] right of procreation." *Avery*, 660 F.2d at 114.

> 3.  *Medical Standards of Care Are Subject to Factual Dispute and Do Not Supplant the Court's Role in Determining Whether Constitutional Rights Were Violated*

Defendants allege—again reaching outside the Complaint to insert factual allegations not plead by M.C.—that the sex assignment surgery, whatever its impact on M.C.'s male fertility and sexual function, necessarily withstands constitutional scrutiny because it was "the standard of care at the time." Amrhein Br. at 8, 18; *see also* Aaronson and Appiagyei-Dankah Br. at 21. Notably, Defendants cite nothing in the Complaint for this proposition, and the applicable standards of care are among the contested factual issues in this case.[4]

---

[4] M.C. alleges in his Complaint that applicable standards of care recognize that children with intersex conditions can be provisionally raised as girls or boys without early sex assignment surgery, and that such surgeries can be delayed until children are old enough for their gender identity to emerge. *See, e.g.*, JA 19, ¶¶ 32, 33. Moreover, it would not be within any applicable standard of care for M.C. to

23

Even if performing a medically unnecessary sex assignment surgery on a sixteen-month-old child was within the standards of care applicable at the time, this does not alter the clear, independent constitutional imperative that Defendants, as state actors, could not interfere with M.C.'s right to decide whether to beget a child absent a compelling state interest. *Cf. Vitek v. Jones*, 445 U.S. 480, 491 (1980) (where a state statute provided that a prisoner deemed mentally ill by an examining doctor could be involuntarily transferred to a mental health facility for treatment, "reliance on the opinion of a designated physician or psychologist for determining whether the conditions warranting a transfer exist neither removes the prisoner's interest from due process protection nor answers the question of what process is due under the Constitution."); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (distinguishing treatment consistent with the medical standard of care from constitutional requirements); *Roe v. Elyea*, 631 F.3d 843, 860–61 (7th Cir. 2011) (denying qualified immunity to prison officials whose failure to deviate from the general medical standard of care as necessary resulted in an inmate receiving constitutionally inadequate care); *Cameron v. Tomes*, 990 F.2d 14, 20 (1st Cir. 1993) ("Nothing in the Constitution mechanically gives controlling weight

---

be subjected to the sex assignment surgery without informed consent, and—contrary to Defendants' efforts to assert facts outside of the Complaint—M.C. does not allege that the defendant doctors obtained the requisite informed consent.

24

to one set of professional judgments.  Indeed, when it comes to constitutional rights, none of the professionals has the last word.").

This Court's key cases establishing the right not to be subjected to state-compelled destruction of fertility also involve medical decision-making and professional judgments by doctors.  In *Cox* and *Avery*, the sterilizing surgeries were performed by doctors in the exercise of their medical judgment.  Indeed, medically unnecessary sterilization of disabled people and other citizens whom state authorities considered unfit to reproduce — undertaken absent any compelling state interest or sufficient pre-deprivation legal process — was long common practice in this country.  *See, e.g.*, Elizabeth S. Scott, *Sterilization of Mentally Retarded Persons: Reproductive Rights and Family Privacy*, 1986 DUKE L.J. 806, 809–10 (1986) (describing history of state laws authorizing sterilization of "mentally deficient persons and others believed to be societal burdens").  But the medical judgment exercised in *Cox* and *Avery* could not overcome the fundamental rights of the patients in those cases—one of whom was a minor—to make decisions about their own reproductive destinies.  *Cox* and *Avery* put Defendants on clear notice that following an allegedly applicable medical standard of care does not automatically equal constitutional compliance, especially where the medical treatment at issue would destroy fertility.

Defendants also expend several pages dissecting blog posts and a student law review note authored by one of M.C.'s counsel in an attempt to prove that M.C.'s rights were not clearly established.  *See, e.g.*, Aaronson and Appiagyei-Dankah Br. at 13–15; Aydlette, Williams, Davis, and Searcy Br. at 22 n.2; Amrhein Br. at 12, 13, 15–16.  Defendants' effort is unavailing, and not just because they have wrested counsel's comments out of context.[5]  Court precedent, not student notes or blog posts, determines whether qualified immunity applies. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (Supreme Court precedent, Fourth Circuit precedent, and state supreme court precedent generally determine qualified immunity questions).

Defendants' argument that there was no clearly established law concerning a surgery that Defendants knew would irrevocably destroy any male fertility and sexual function fails in light of binding precedent.  Defendants advance no state interest furthered by subjecting M.C. to surgery that irrevocably deprived him of

---

[5] For example, Defendant Amrhein claims in his brief that Plaintiff's counsel "concedes" that guardians have the right to impose sex assignment surgery on infant wards, citing counsel's student note.  Amrhein Br. at 15.  The quoted text, read in context, simply explains why a malpractice claim sounding in torts may be insufficient to address the violation of infants' rights. *See* Anne Tamar-Mattis, *Exceptions to the Rule: Curing the Law's Failure to Protect Intersex Infants*, 21 BERKELEY J. GENDER L. & JUST. 59, 78–81 (2006).  Amrhein fails to acknowledge the conclusion of the section, which is that these surgeries encroach on children's fundamental rights in such an extensive and permanent way that they fall in the class of extraordinary medical decisions where surrogate decision-making processes may be constitutionally inadequate. *Id.* at 90–93.

the ability to decide whether to beget a child.  Under such circumstances,
Defendants could not have reasonably believed that their conduct was lawful under
the Supreme Court's and this Court's longstanding precedents.  This Court should
affirm the District Court's denial of qualified immunity on the grounds that M.C.
has sufficiently alleged a violation of his clearly established right to procreation.

>    B.    Defendants' Authorization of an Irreversible and Medically
>          Unnecessary Sex Assignment Surgery Violated M.C.'s Clearly
>          Established Right to Bodily Integrity

Although the District Court did not reach the issue, Defendants' actions to
permanently and irreversibly alter M.C.'s body by performing a sex assignment
surgery which irrevocably altered the appearance and function of his genitals also
constituted a severe invasion of M.C.'s clearly established Fourteenth Amendment
right to bodily integrity.[6]  Over a hundred years ago, the Supreme Court
recognized that "no right is held more sacred, or is more carefully guarded by the
common law, than the right of every individual to the possession and control of his
own person, free from all restraint or interference of others, unless by clear and
unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250,
251 (1891) (affirming lower court's refusal to compel a personal injury plaintiff to
submit to surgical examination).

---

[6] As this Court is aware, it "may affirm a district court's decision on different
grounds than those employed by the district court." *Shafer v. Preston Mem'l Hosp.
Corp.*, 107 F.3d 274, 275 n.1 (4th Cir. 1997).

Since at least 1952, it has been clear that the Fourteenth Amendment's due process clause does not allow state officials to invade a person's body to further less-than-compelling government interests. In *Rochin v. California*, 342 U.S. 165 (1952), the Court held that three deputy sheriffs' actions in subduing, reaching into the mouth of, and ultimately arresting and subjecting to forced stomach pumping a man who had swallowed capsules of morphine—all for the purpose of recovering the capsules as evidence against him—violated due process:

> This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities.

*Id.* at 172.

The contours of the right to bodily integrity were further elaborated in *Winston v. Lee*, 470 U.S. 753 (1985). In *Winston*, Virginia state officials sought to compel a robbery suspect to undergo medically unnecessary surgery under general anesthesia to extract a bullet lodged in his chest that was believed to constitute evidence of his guilt or innocence. *Id.* at 755. The Court held that the surgery was not a reasonable search within the meaning of the Fourth Amendment,[7] reasoning

---

[7] Since at least 1992, *Winston* has been understood to establish the contours of the due process right to bodily integrity as well as the Fourth Amendment right to security in one's person. *See Casey*, 505 U.S. at 849 (citing *Rochin* and *Winston* as establishing Fourteenth Amendment due process right to bodily integrity); *see also Sell v. United States*, 539 U.S. 166, 176 (2003) (citing *Winston* for the proposition

that the intrusion posed to suspect's bodily integrity was intolerable, even when measured against the "great importance" of the state interest in gathering evidence relevant to the suspect's guilt or innocence. *Id.* at 762–66. In so holding, the Court observed that the surgery posed "dispute[d]" but "not extremely severe" medical risks and that the suspect had been afforded "a full measure of procedural protections and has been fully able to litigate the difficult medical and legal questions necessarily involved in analyzing the reasonableness of surgical incision of this magnitude." *Id.* Despite this, the Court deemed the intrusion of the suspect's body too great to allow: "[t]he intrusion on respondent's privacy interests entailed by the operation can only be characterized as severe." *Id.* at 766.

These precedents make clear that state officials may not engage in medically unnecessary, involuntary surgery on persons in state custody without a compelling interest in doing so. *See also Missouri v. McNeely*, 133 S.Ct. 1552, 1565 (2013) ("We have never retreated, however, from our recognition that any compelled intrusion into the human body implicates significant, constitutionally-protected privacy interests."); *cf. State v. Brown*, 326 S.E.2d 410, 412 (S.C. 1985) (rejecting efforts by convicted sex offenders to enforce suspended sentences contingent on their submission to surgical castration because "[c]astration, a form of mutilation" was prohibited by the South Carolina constitution's ban on cruel and unusual

that involuntary medical treatment implicates liberty protected by the Fifth Amendment's due process clause).

29

punishment).  In their briefs, Defendants advance no state interest whatsoever in

support of their decision to perform irreversible surgery on the most intimate parts

of M.C.'s body.  That M.C. had a right not to undergo the sex assignment surgery

is even more evident in light of the severe risks and irreversible consequences

associated with the procedure.  Defendants knew that the surgery entailed, at a

minimum, destruction of male fertility, loss of sexual function, and scarring.  JA

24–25, ¶ 50.

Under such circumstances, M.C.'s right not to be subjected to this

irreversible and medically unnecessary sex assignment surgery was clearly

established.  *See Casey*, 505 U.S. at 857 (Supreme Court cases establishing right to

make reproductive decisions implicate the right to bodily integrity and have

"doctrinal affinity to cases recognizing limits on governmental power to mandate

medical treatment or to bar its rejection"); *Winston*, 470 U.S. at 763–66 (state-

ordered medically unnecessary surgery to recover evidence was an impermissible

bodily intrusion even where risks of surgery were "not extremely severe").

C.    Defendants Violated M.C.'s Clearly Established Right to Privacy in
      Relation to Adult Sexual Expression When They Subjected Him to a
      Medically Unnecessary Sex Assignment Surgery

Defendants' actions also violated M.C.'s clearly established right to privacy

in matters related to adult sexuality.  Since at least 2003, the Supreme Court has

recognized a right to autonomy in matters related to adult sexuality—specifically,

the right to be free from unnecessary government intrusion into intimate decisions as they relate to an individual's lawful sexual conduct. *See Lawrence v. Texas*, 539 U.S. 558, 562 (2003) ("Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."); *see also Casey*, 505 U.S. at 847 ("It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter."). In *Lawrence*, the Court recognized that Texas' criminalization of consensual same-sex sexual conduct impermissibly intruded on individuals' rights to privacy: "The petitioners are entitled to respect for their private lives . . . . The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." 539 U.S. at 578.

Any reasonable person would understand that a sex assignment surgery, by removing M.C.'s penis and testicle and restructuring his genitals to have a typical female appearance, would have profound and potentially devastating implications for his future adult sexuality and intimate relationships. Indeed, because of the profound ramifications of such surgery, doctors typically suggest that adults seeking sex assignment surgery undergo counseling to make sure they understand the risks and implications of their decisions. JA 19 ¶ 32. By subjecting M.C. to the assignment surgery, Defendants irrevocably forced him to conform to their ideas of how his sexual organs should appear and function.

31

Due process did not permit Defendants to sacrifice M.C.'s deeply personal interest in future adult sexual intimacy for the purpose of conforming his genital appearance to their preferences. *Cf. Lawrence*, 539 U.S. at 571 (long-standing mores regarding the traditional family and disapproval of same-sex sexual conduct could not justify intruding on individual privacy by criminalizing such conduct); *Casey*, 505 U.S. at 852 (the question of whether to become a parent implicates issues "too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in our history and culture."); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 744 (5th Cir. 2008) ("The right the Court recognized [in *Lawrence*] was not simply a right to engage in the sexual act itself, but instead a right to be free from governmental intrusion regarding 'the most private human contact, sexual behavior.'") (quoting *Lawrence*, 539 U.S. at 567).

The irreversible and medically unnecessary surgery implemented by Defendants strikes at the heart of personal and intimate choices protected from state intrusion because it will inevitably and profoundly affect M.C.'s adult sexual autonomy and his intimate relationships with others. *See Lawrence*, 539 U.S at 567 ("When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring."). M.C. was not given the opportunity to decide for himself—or even

32

opine—on the deeply private matter of what his genitals should look like, nor whether he would choose to sacrifice male fertility and sexual function. *See Casey*, 505 U.S. at 851 ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the state."). Defendants have explained no state interest in usurping this most intimate of decisions. Given the profound impact that sex assignment surgery will have—and already has had—on M.C.'s life, due process barred state officials from irreversibly destroying M.C.'s healthy genitalia and imposing their preferences on M.C.'s body.

> D. **M.C.'s Status as a Minor Does Not Negate His Clearly Established Rights of Procreation, Bodily Integrity, and Privacy and the SCDSS Defendants' Custody of M.C. Did Not Grant Them Rights Coextensive With Those of a Parent**

Defendants argue that, notwithstanding these clearly established rights, their conduct does not amount to a constitutional deprivation because: (1) as a minor, M.C. had no constitutional right to avoid conduct classified as "medical treatment," even if that treatment was a medically unnecessary and fertility-destroying sex assignment surgery; and (2) the SCDSS Defendants, acting *in loco parentis*, have rights coextensive with those of an actual parent over M.C.'s body while he was in SCDSS custody, allowing them to make any medical decisions they chose. These arguments are wrong.

33

1.    *Minors Enjoy Significant and Clearly Established Constitutional Rights to Reproductive Autonomy and to Bodily Integrity and Privacy*

M.C. alleges that by castrating him, removing his penis and refashioning his genitals to appear female, Defendants violated his clearly established rights to make deeply personal decisions about procreation and to bodily integrity and privacy.  The Supreme Court has long recognized that "[m]inors, as well as adults, are protected by the Constitution and possess constitutional rights." *Danforth*, 428 U.S. at 74.  More specifically, the Supreme Court has repeatedly held that minors have a due process right to determine whether they will procreate, even when such wishes might conflict with those of their parents.  *See Bellotti v. Baird*, 443 U.S. 622, 643 (1979) ("[I]f the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained."); *Danforth*, 428 U.S. at 74 (striking down state law providing for absolute parental veto over a minor's decision to terminate a pregnancy).  Moreover, the Fourth Circuit's decision in *Avery v. Cnty. of Burke*, which established the right of a minor not to be subjected to medically unnecessary sterilization, put Defendants on clear notice that they could not authorize the destruction of M.C.'s male reproductive capacity, simply because he was a minor under their power.  *See* 660 F.2d at 115 (state officials' alleged coercion of fifteen-year-old girl and her mother to consent to the girl's sterilization, if proven, would violate due process).

34

Children, like other persons who may not be considered legally competent to consent to medical treatment, also have a clearly established right to bodily integrity and privacy which encompasses a right to be free from unreasonable and unnecessary intrusions by the state. *See Hall v. Tawney*, 621 F.2d 607, 613–14 (4th Cir. 1980) (recognizing school children's rights to bodily integrity); *see also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1207 (10th Cir. 2003) (medical examinations involving genital examinations and blood tests implicated preschoolers' rights to privacy, dignity, and autonomy); *Roe v. Tex. Dep't of Protective and Regulatory Servs.*, 299 F.3d 395, 406–08 (5th Cir. 2002) (six-year-old girl had "potent" privacy interest that barred a social worker from conducting a visual vaginal examination absent a court order or exigent circumstances); *Tenenbaum v. Williams*, 193 F.3d 581, 597–600, 605–07 (2d Cir. 1999) (case worker's subjection of a five-year-old "developmentally delayed" girl to gynecological examination without a court order violated her right to bodily integrity and procedural due process); *Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir. 1980) ("It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency.").

35

Defendants' principal argument—because M.C. was in state custody, Defendants could perform whatever elective surgeries they deemed appropriate—provides far too much latitude for state actors and would allow egregious violations of children's bodily integrity and privacy.  This limitless view of state authority would allow children in state custody to be subjected to medically unnecessary and risky procedures, such as experimental surgeries, drug trials, cosmetic procedures, or other treatments for which the risks posed to a young child clearly outweigh any medical benefit.

In their brief, Defendants Aaronson and Appiagyei-Dankah rely on the inapposite case of *PJ ex rel. Jenson v. Wagner*, 603 F.3d 1182 (10th Cir. 2010) for their claim to broad dominion over medical decision-making.  Aaronson and Appiagyei-Dankah Br. at 12–13.  In *PJ*, the court held that state officials were entitled to qualified immunity for interfering with the rights of parents to determine their child's medical treatment in the context of an urgently life-threatening situation, where "a state's interest in protecting the child is at its zenith."  603 F.3d at 1198.  PJ was diagnosed with cancer that required immediate chemotherapy, to which his parents refused consent.  *Id.* at 1189–90.  Doctors opined that continued denial of chemotherapy would result in the child's death.  *Id.* at 1188.  Accordingly, state child protective officials sought and won, in juvenile court, *a court order* to compel PJ to submit to chemotherapy.  *Id.* at 1189–90.  In marked

36

contrast with the advanced cancer suffered by the minor in *PJ*, M.C.'s intersex condition was not life-threatening. PJ would likely die without receiving chemotherapy, but the surgery to which M.C. was subjected was elective and could be delayed. And, unlike the state officials in *PJ*, Defendants here did not even bother to seek a court hearing or any review by a neutral decision-maker regarding the proposed life-altering surgery.

Defendant Amrhein argues—contrary to the allegations in the Complaint—that the sex assignment surgery at issue was performed for legitimate "psychosocial reasons." Amrhein Br. at 11. Defendants Aaronson and Appiagyei-Dankah correspondingly intimate—also contrary to the allegations in the Complaint—that Defendants' decision to remove M.C.'s healthy genitalia was out of concern for his wellbeing, whereas the cases of forced sterilization were aimed at "social problems." Aaronson and Appiagyei-Dankah Br. at 11. While it is true that certain elective medical procedures may implicate "psychosocial concerns," the elective surgery at issue here irrevocably destroyed male fertility and sexual function, radically restructured M.C.'s genitals, and involved significant risks, psychological and physical. As Defendant Aaronson himself recognized in a journal article published before he performed M.C.'s sex-assignment surgery, "carrying out a feminizing genitoplasty on an infant who might eventually identify herself as a boy would be *catastrophic*." JA 23–24, ¶ 47 (emphasis added).

As with this case, the coerced sterilization cases cited *supra* in section II.A involved state officials acting to address perceived "psychosocial concerns." Specifically, the plaintiffs in those cases—many of whom were minors, intellectually disabled persons, or other persons considered incapable of meaningful consent—were making reproductive choices that state officials did not view as beneficial either for society or for the well-being of the individuals themselves. *See, e.g.*, *Vaughn*, 253 F.3d at 1129 (intellectually disabled woman had neglected her children and was unable to reliably use contraception); *Avery*, 660 F.2d at 113 (state officials urged a fifteen-year-old minor and her mother to consent to the minor's sterilization where the minor had previously gotten pregnant and was initially believed to have the sickle cell trait). Even asserted concerns for these individuals' well-being, however, did not authorize state officials' coercive efforts to sterilize them. *Cf. Avery*, at 115 (noting "standardless discretion" afforded county health officials who urged sterilization for minor believed to carry the sickle cell trait); *see also Vaughn*, 253 F.3d at 1129 (state interest in sterilizing an intellectually disabled woman who was unable to reliably use contraception and to care for her children did not immunize a state social worker who "dispense[d] with procedural protections, coerce[d] an individual into sterilization, and then after the fact argue[d] that it was justified.").

Defendants argue that they reasonably sought to remove M.C.'s penis and testicle and radically alter his healthy genitalia when he was only sixteen months old, absent any medical necessity or state interest, and despite knowing that such a surgery would irrevocably destroy male fertility and severely inhibit sexual function. JA 22–25, ¶¶ 45, 46, 49–50. Defendant Amrhein contends that if the surgery was not performed with the intent to sterilize, and was instead "performed solely to conform M.C.'s genitals to the chosen sex of rearing," it violated no clearly established right. Amrhein Br. at 18. But Defendants were not entitled to surgically alter M.C.'s body to conform to the gender they chose for him where, as here, they knew that an unavoidable outcome of the surgery was complete destruction of male fertility and sexual function.

Even assuming *arguendo* that M.C.'s rights were not fully coextensive with those of an adult, there was no medical necessity or compelling state interest in subjecting him to fertility-destroying, irreversible surgery that had obviously profound implications for his ability to experience adult sexual intimacy. Defendants' purportedly good intentions are insufficient to justify permanent interference with M.C.'s reproductive autonomy, bodily integrity, and ability to experience adult sexual intimacy. *Cf. Henry*, 652 F.3d at 535 (qualified immunity does not shield even well-meaning state actors who make unreasonable mistakes).

39

Under such circumstances, M.C.'s clearly established Fourteenth Amendment rights were violated.

> 2.     *SCDSS Authority To Make Medical Decisions for M.C. Did Not*
>        *Authorize Violation of His Constitutional Rights, Nor Is SCDSS'*
>        *Authority To Control the Bodies of Children in its Custody*
>        *Coextensive With That of a Parent*

Defendants also contend that because SCDSS had legal authority to make medical decisions for M.C. while he was in their custody, they were acting *in loco parentis* and were entitled to subject M.C. to any procedures they deemed appropriate, so long as such procedures are classifiable as "medical treatment." Aaronson and Yaw Appiagyei-Dankah Br. at 12, Amrhein Br. at 11, 14. The defendant doctors—counter to the allegations in the Complaint—assert that they obtained informed consent for the sex assignment surgery and that such consent would automatically render the surgery constitutional. As discussed immediately *supra* in section II.D.1, this argument completely ignores the fact that children have well-established rights to procreation, to bodily integrity, and to privacy, even in the face of parental and other legally-authorized adult authority over their persons.

Defendants claim that by acting *in loco parentis*, SCDSS has acquired the same constitutionally protected rights of authority over children in state custody that parents enjoy over their children. Amrhein Br. at 14; Aydlette, Williams, Davis and Searcy Br. at 12. But the constitutional rights of parents to control the

40

upbringing of their children arise in the context of the "private realm of family life which the *state cannot enter*." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (emphasis added). Moreover, "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot(ing) a way of life' through the instruction of children." *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 844 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972)). Accordingly, the Supreme Court has held that even foster parents who may have created substantial emotional bonds with the children in their care cannot claim the same constitutionally protected privacy rights as permanent parents. *Smith*, 431 U.S. at 842–46. Defendants' custody of M.C. was state-created and temporary; it was not parental or even familial.

Even if Defendants did enjoy rights to control the bodies of the children in their custody on par with those of a parent, the Supreme Court and this Court have repeatedly recognized that parents do not exercise absolute dominion over their children's bodies, particularly where decisions relating to reproduction are concerned. *See, e.g.*, *Bellotti*, 443 U.S. at 643 (unique nature and consequences of decision to undergo abortion make it inappropriate to give a third party decision-making authority); *Danforth*, 428 U.S. at 74 (striking down state law providing for absolute parental veto over a minor's decision to terminate a pregnancy); *Avery*,

660 F.2d at 115–16 (county board of health and county board of social services could be held liable for coercing a fifteen-year-old minor *and her mother* to consent to sterilization); *see also H. L. v. Matheson*, 450 U.S. 398, 449 (1981) ("Parental authority is never absolute, and has been denied legal protection when its exercise threatens the health or safety of the minor children."); *Lake v. Arnold*, 232 F.3d 360, 365 (3d Cir. 2000) (*Lake II*) (parents could be held liable under 42 U.S.C. §§ 1983 and 1985 for collaborating with doctors and hospital to have their sixteen-year-old daughter sterilized without her informed consent); *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994) (a child has "obvious and compelling interests in his personal welfare and safety, which are opposed to those of his parents when they pose the threat to the child's safety").

Defendants rely on a factually unmoored reading of *Parham v. J.R.*, 442 U.S. 584 (1979) for their argument that SCDSS officials had full authority to act as a parent might in authorizing the sex assignment surgery performed on M.C. Amrhein Br. at 14–15, Aydlette, Williams, Davis, and Searcy Br. at 12–18.  In *Parham*, the Court held that procedures used by state mental health facilities to decide whether to temporarily commit minors "whose parents or guardian seek state administered institutional mental health care" passed constitutional muster. 442 U.S. at 587.  The Court held that "with respect to a decision on commitment to a mental hospital, the State may constitutionally allow [a] custodial agency to

42

speak for the child" in an initial decision about seeking commitment. *Id.* at 619. The Court noted, however, that this authority was "subject, of course, to the restrictions governing natural parents." *Id.* It further explicitly cautioned that a state agency might not adequately represent a ward's interests when longer-term deprivation of liberty was contemplated:

> It is possible that the procedures required in reviewing a ward's need for continuing care should be different from those used to review the need of a child with natural parents . . . . The absence of an adult who cares deeply for a child has little effect on the reliability of the initial admission decision, but it may have some effect on how long a child will remain in the hospital . . . . For a child without natural parents, we must acknowledge the risk of being "lost in the shuffle."

*Id.* at 619.

Contrary to Defendants' sweeping interpretation, *Parham* dealt only with the constitutional adequacy of the state's procedures for determining whether to temporarily commit minors in a mental health facility upon the request of a parent or custodial state agency. It did not deal with the rights of the minors to procreate, nor with any other permanent infringement on the minors' liberty interests. Indeed, the Court in *Parham* vigorously distinguished *Danforth*, which dealt with the distinct issue of whether parents had absolute power over their children's right to make reproductive decisions. 442 U.S. at 604–05 (distinguishing *Danforth* as rejecting an "absolute parental veto" over a minor's decision whether to have an abortion); *see also id.* at 623 n.6 (Stewart, J., concurring) (*Danforth* involved a

minor's "personal substantive constitutional right" to decide whether to have an abortion, whereas "the appellees in this case had no substantive constitutional right not to be hospitalized for psychiatric treatment."); *id.* at 631 n.18 (Brennan, J., concurring in part and dissenting in part) ("[M]ore recent legal disputes involving the sterilization of children had led to the conclusion that parents are not permitted to authorize operations with such far-reaching consequences."). The Court also countered any implication that its decision authorized a parent's or state agency's "absolute right" to commit their children to a mental hospital. *Id.* at 604. Here, where state officials have caused a healthy child to permanently lose all male reproductive and sexual function, *Parham*, in fact, underscores that Defendants had no lawful authority to approve this surgery.[8]

---

[8] The Defendant doctors also claim—counter to the allegations in the Complaint— that M.C.'s birth mother consented to the sex assignment surgery. Aaronson and Appiagyei-Dankah Br. at 5; Amrhein Br. at 5. Even if that were so, the doctors sought the authorization necessary for the surgery to proceed from Defendant Searcy, an SCDSS employee, not the birth mother. JA 26, ¶ 59. Nor would it have been reasonable to rely on any maternal acquiescence in the surgery. M.C. was in SCDSS custody throughout the entire time the surgery was planned and effectuated. JA 20–21, 23, 24, ¶¶ 37–39, 46, 49. SCDSS had assumed custody because it believed there was serious risk that the birth mother would physically neglect M.C. JA 20, ¶ 36. SCDSS officials expressed concerns that it was difficult to reach the birth mother for medical decision-making, and a state court had found that, because of her mental state, "the continuation of the child in the home [was] contrary to the welfare of the child." JA 20, ¶ 36, JA 180, ¶ 4. When the surgery was performed, M.C. had been in SCDSS custody for over a year, and SCDSS had been pursuing termination of the mother's rights for nine months. JA 20–21, ¶¶ 37–39. The mother was in no position to resist SCDSS' plans, and no reasonable state actor could rely on her to provide meaningful consent. *See, e.g., Vaughn*, 253

### III. Defendants Violated the Fourteenth Amendment's Procedural Due Process Guarantees When They Performed a Fertility-Destroying Sex Assignment Surgery Absent a Pre-Deprivation Hearing Before a Neutral Fact Finder

The District Court correctly held that M.C. sufficiently alleged a violation of his clearly established Fourteenth Amendment right to procedural due process, observing that "[t]he complaint alleges that defendants recognized that M.C.'s sex assignment surgery would likely sterilize him, but proceeded with the surgery without regard to its irreversible consequences and without providing M.C. with prior notice or a hearing." JA 246–47. No procedure could have justified the medically unnecessary removal of M.C.'s healthy penis and testicle, where, as here, there was "no compelling reason" that M.C. undergo feminizing sex assignment surgery. *See* JA 23, ¶ 46(e). But despite knowing that their decisions to surgically castrate M.C. would permanently eliminate any ability for him to beget a child, Defendants failed to seek a pre-deprivation hearing of any kind. In so doing, Defendants ignored decades of constitutional precedent requiring a pre-deprivation hearing before a neutral fact finder before an individual incapable of consent may be subjected to fertility-destroying surgery.

---

F.3d at 1130 ("any reasonable person, social worker or not" would understand that consent to sterilization provided under threat of losing one's child was not valid consent). Moreover, even if M.C.'s birth mother expressed any opinion regarding the surgery, it was clear that she did not have an absolute right to make irreversible decisions related to M.C.'s fertility. *See supra* section II.D.1.

45

The measure of constitutionally adequate process "depends on the extent to which an individual will be condemned to suffer grievous loss." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (internal quotation marks omitted). The minimum process due under the Constitution is generally determined by considering three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The Supreme Court has repeatedly recognized that the rights to reproduction, privacy, and bodily integrity are within the core private liberty interests protected by the Fourteenth Amendment, and that any infringement of these interests by the state must be narrowly tailored and supported by a compelling state interest. *Washington*, 521 U.S. at 720-21; *Carey,* 431 U.S. at 685–86.

In this case, the risk of erroneous deprivation of M.C.'s fundamental liberty interests was high. The surgery would cause lifetime destruction of male fertility and sexual function and risked gender misalignment. JA 24-25, ¶ 50. A hearing in which a neutral fact finder could weigh the risks and purported benefits of early surgery, as well as the possibility of postponement or alternatives to surgery, could

46

have prevented the grievous loss experienced by M.C.  Defendants have asserted

no state interest in pursuing this surgery, nor have they asserted that seeking a pre-

deprivation hearing would be unduly burdensome.[9]

Defendants' failure to seek a pre-deprivation hearing of any kind was also

starkly at odds with precedent discussing minimum procedures required before the

state may subject an individual to fertility-destroying surgery.  Since 1927, the

Supreme Court has recognized that, at minimum, a hearing before a neutral fact

finder is essential before a state may embark on even a justified involuntary

sterilization.  *See Buck v. Bell*, 274 U.S. 200, 206–07 (1927).  In *Buck v. Bell*, the

Supreme Court upheld a Virginia law authorizing involuntary sterilizations of

"mental defectives" against an equal protection and due process challenge.  274

U.S. 200, 205–08.  In so doing, however, the Court emphasized as central to its

decision the "very careful provisions by which the act protects the patients from

possible abuse," including notice, the appointment of a guardian for the individual

to be sterilized, a hearing to ensure that the asserted government interest in

sterilization was compelling and "the rights of the patient [are] most carefully

considered," and a thorough court appeals process.  *Id.* at 206–07.

Similarly, in *Skinner v. Okla. ex rel. Williamson*, the Court invalidated a

mandatory sterilization statute on equal protection grounds, with two concurring

---

[9] Even if they did, such assertions would be contested factual issues, subject to
discovery, and not resolvable in a motion to dismiss posture.

justices expressing concern that the court proceedings required to authorize the sterilization procedure were too limited in scope to comport with due process. 316 U.S. at 535; *id.* at 545 (Stone, J. concurring) ("[A] law which condemns, without hearing, all the individuals of a class to so harsh a measure as the present because some or even many merit condemnation, is lacking in the first principles of due process.").

Since *Buck* and *Skinner*, state courts have widely recognized and state statutes have widely reflected that pre-deprivation hearings before a neutral fact finder, generally in a court of law, are required before an individual incapable of consent can be sterilized. *See, e.g.,* Conn. Gen. Stat. Ann. § 45a-691 (West 2014); Fla. Stat. Ann. § 744.3215 (West 2013); Ga. Code Ann. § 31-20-3 (West 2013); Idaho Code Ann. § 39-3903 (West 2014); Me. Rev. Stat. Ann. tit. 34-B, § 7004 (West 2009); N.C. Gen. Stat. Ann. § 35A-1245 (West 2013); Nev. Rev. Stat. Ann. § 159.0805 (West 2013); N.D. Cent. Code Ann. § 23-12-13(4) (West 2013); Okla. Stat. Ann. tit. 10A, § 1-3-103 (West 2013); Utah Code Ann. § 62A-6-102 (2) (West 2013); Va. Code Ann. § 54.1-2975 (West 2013); *In re Op. of the Justices*, 162 So. 123, 127 (Ala. 1935); *C.D.M. v. State*, 627 P.2d 607, 612 (Alaska 1981); *Conservatorship of Valerie N. v. Valerie N.*, 707 P.2d 760, 777 (Cal. 1985); *In re A.W.*, 637 P.2d 366, 370 (Colo. 1981) (en banc); *Motes v. Hall Cnty. Dep't of Fam. & Child. Servs.*, 306 S.E.2d 260, 262 (Ga. 1983); *In re Estate of K.E.J.*, 887

48

N.E.2d 704, 717 (Ill. App. 2008); *Williams v. Smith*, 131 N.E. 2 (Ind. 1921);

*Holmes v. Powers,* 439 S.W.2d 579 (Ky. Ct. App. 1968); *In re Debra B.,* 495 A.2d

781, 783 (Me. 1985); *Wentzel v. Montgomery Gen. Hosp., Inc.*, 447 A.2d 1244,

1253–54 (Md. 1982); *In re Moe*, 432 N.E.2d 712, 716–17 (Mass. 1982); *Wirsing*

*ex rel. Wirsing v. Mich. Prot. & Advocacy Serv.*, 573 N.W.2d 51, 54 (Mich. 1998);

*In re Hillstrom*, 363 N.W.2d 871, 875–77 (Minn. Ct. App. 1985); *In re Penny N.,*

414 A.2d 541, 543 (N.H. 1980); *In re Grady*, 426 A.2d 467, 475 (N.J. 1981); *In re*

*Moore,* 221 S.E.2d 307, 309-16 (N.C. 1976); *In re Terwilliger,* 450 A.2d 1376,

1380–84 (Pa. Super. Ct. 1982); *In re Hayes,* 608 P.2d 635, 639–41 (Wash. 1980)

(en banc); *see also* Alaska Stat. Ann. § 13.26.150 (West 2013) (guardian may not

consent to sterilization of mentally incapacitated ward absent danger to life or

serious impairment of physical health); R.I. Gen. Laws Ann. § 11-9-17 (West

2013) (declaring medically unnecessary sterilization of minors a felony); *In re*

*M.K.R.*, 515 S.W.2d 467, 470–71 (Mo. 1974) (en banc) (finding no jurisdiction to

authorize sterilization absent statute establishing procedural safeguards); *Frazier v.*

*Levi,* 440 S.W.2d 393, 394–95 (Tex. Civ. App. 1969) (same).

    In light of *Buck*, the weight of state authority, and the *Mathews* factors, it is

clear that, at minimum, a pre-deprivation hearing before a neutral third party was

required before Defendants could proceed with the sex assignment surgery.  In

defending their failure to request any kind of hearing or ethics review before

subjecting M.C. to an irreversible sex assignment surgery, Defendants again rely

on *Parham v. J.R.*, 442 U.S. 584 (1979) for the proposition that, in some cases,

state actors themselves may make decisions that temporarily implicate children's

liberty interests without court review.  Amrhein Br. at 14-15; Adylette, Williams,

Davis, and Searcy Br. at 15-18, Aaronson and Appiagyei-Dankah Br. at 20.  In

*Parham*, the Supreme Court held that state agencies and parents could seek to have

minors in their custody initially committed to mental health facilities on a

temporary basis.  442 U.S. at 606–07.  The Court also held, however, that due

process required that a "neutral factfinder" make the commitment decision

according to independent criteria and that "the child's continuing need for

commitment be reviewed periodically by a similarly independent procedure."  *Id.*

It is well-established that the process due an individual prior to state

deprivation of that person's liberty interest depends on the nature of the liberty

interest at stake.  *Morrissey*, 408 U.S. at 481.  The Court in *Parham* emphasized its

due process analysis applied only to an initial decision as to whether a minor could

be temporarily committed to a mental institution, and specifically distinguished the

facts before it from previous cases involving minors' reproductive rights.  442 U.S.

at 603–05, 607 n.15; *see also supra* section II.D.2.  Here, in contrast, Defendants

sought *no review whatsoever* of their decision to perform an irreversible and

fertility-destroying sex assignment surgery on a sixteen-month-old child, and

50

proceeded despite the fact there was "no compelling reason" that M.C. be surgically feminized.  JA 23, ¶ 46.  *Parham* required procedural safeguards even though a minor's liberty interest would be infringed only temporarily by the commitment decision. *See id.* at 615.  But here, there was no neutral fact finder reviewing Defendants' irrevocable decision-making.

Defendants quote in isolation the Court's statement in *Parham* that "[w]hat is best for a child is an individual medical decision that must be left to the judgment of physicians in each case."  Aaronson and Appiagyei-Dankah Br. at 20. Defendants claim that meaningful review was achieved in this case simply because the defendant doctors recommended and decided to perform M.C.'s sex assignment surgery.  *Id.* at 21.  But constitutionally adequate procedure is not established simply because a doctor invokes his professional judgment.  *See Vitek*, 445 U.S. at 491 ("Nebraska's reliance on the opinion of a designated physician or psychologist for determining whether the conditions warranting a transfer exist neither removes the prisoner's interest from due process protection nor answers the question of what process is due under the Constitution.").  Indeed, in *Avery*, this Court noted that "standardless discretion" exercised by medical authorities in determining whether to urge sterilization for patients could cause violations of those patients' constitutional rights.  660 F.2d at 115.

51

Notably, even the cases Defendants cite in support of their professional-judgment-as-due-process-theory involved instances of forced psychiatric medication in criminal confinement settings—not irreversible and sterilizing surgery performed on a healthy toddler—and all involved considerably more procedural protections than provided here, including an avenue for judicial review. *See Washington v. Harper*, 494 U.S. 210, 215–16 (1990) (due process satisfied by policy that allowed involuntary psychiatric medication of inmate only after notice and opportunity for a hearing before "a special committee consisting of a psychiatrist, a psychologist, and the Associate Superintendent of the [Special Offender] Center, none of whom may be, at the time of the hearing, involved in the inmate's treatment or diagnosis" and also provided for judicial review of the committee's decision); *United States v. Charters*, 863 F.2d 302, 307–08 (4th Cir. 1988) (en banc) (due process was satisfied by psychiatric professionals' decision-making, subject to the "availability of judicial review to guard against arbitrariness").

Defendants also argue that the consent form presumably signed by SCDSS Director Defendant Aydlette and communications among SCDSS officials and the doctors constituted sufficient process. Adylette, Williams, Davis, and Searcy Br. at 17. Such alleged process was not meaningful, however, because Defendants failed to articulate any compelling interest for the surgery, nor did they consider

52

the serious risks and lifelong consequences posed by the surgery.  JA 27–28, ¶ 60–61.  Even if SCDSS officials had inquired, mere communication with medical professionals does not provide sufficient due process, particularly when a procedure implicating fertility is at issue.  *See*, *e.g.*, *Vaughn*, 253 F.3d at 1129–31 (denying qualified immunity to a social worker who coerced a plaintiff to undergo a sterilization absent a prior court hearing, because "[s]terilization results in the irreversible loss of one of a person's most fundamental rights, a loss that must be preceded by procedural protections."); *Lake II*, 232 F.3d at 364 (doctors, hospital, and parents could be liable for arranging for a mentally disabled sixteen-year-old girl to be sterilized where "[a]t no point, did any of the defendants seek to have Elizabeth's interests, as opposed to her parents' interests, reviewed by a court or other appropriate forum"); *Downs*, 574 F.2d at 11–14 (denying immunity to a doctor and social workers who subjected a deaf-mute woman to sterilization without a court hearing); *N.C. Ass'n for Retarded Children v. State of N.C.*, 420 F. Supp. 451, 455–56 (M.D.N.C. 1976) (striking down the portion of a North Carolina statute allowing for sterilization of an intellectually disabled person absent a hearing if the sterilization was requested by a next-of-kin).

Defendants attempt to shift responsibility for pre-deprivation process to one another.  *See, e.g.*, Aydlette, Williams, Davis, and Searcy Br. 15, 17; Aaronson and Appiagyei-Dankah Br. at 18, 21; Amrhein Br. at 15.  But the fact remains that no

procedural safeguards were employed to consider M.C.'s interests in light of the severe physical and psychological risks of performing an irreversible, fertility-destroying surgery on a young child.[10]  M.C. was clearly too young to request such process himself; it was incumbent upon Defendants to initiate the process required. Under the relevant precedent, Defendants denied M.C. the bare minimum of procedural due process required by the Fourteenth Amendment.

## CONCLUSION

The sex assignment surgery implemented by Defendants violated M.C.'s clearly established rights under the Fourteenth Amendment to procreation, to bodily integrity, to privacy, and to procedural due process.  For the reasons stated, this Court should affirm the District Court's denial of qualified immunity.

---

[10] The SCDSS defendants summarily posit that delaying the surgery would have opened them up to liability because the recommendation was made by "physician specialists."  Adylette, Williams, Davis, and Searcy Br. at 21.  Defendants fail to explain why delaying a surgery as medically unnecessary and profound in its lifelong reproductive, sexual, and psychological implications as this one would incur them any constitutional liability, nor can they realistically analogize between their liability as a result of *not* unnecessarily removing a toddler's penis and testicle and the life-saving treatment contemplated in the case law upon which they rely.

## REQUEST FOR ORAL ARGUMENT

M.C. respectfully requests oral argument so that the parties may address any questions the Court may have regarding the important individual rights at stake.

Dated:  April 2, 2014                  Respectfully submitted,

                                       /s/ Kristi L. Graunke
                                       Kristi L. Graunke
                                       SOUTHERN POVERTY LAW CENTER
                                       233 Peachtree St. NE, Suite 2150
                                       Atlanta, GA 30303
                                       (404) 521-6700
                                       *kristi.graunke@splcenter.org*

*On behalf of Attorneys for Appellee*

Anne Tamar-Mattis
ADVOCATES FOR INFORMED
CHOICE
P.O. Box 676
Cotati, CA 94931
(707) 793- 1190
*director@aiclegal.org*

John Lovi
William Ellerbe
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506 3900
*jlovi@steptoe.com*
*wellerbe@steptoe.com*

David Dinielli
Alesdair H. Ittelson
SOUTHERN POVERTY LAW
CENTER
400 Washington Avenue
Montgomery, AL 36104
(334) 956-8200
*alesdair.ittelson@splcenter.org*
*david.dinielli@splcenter.org*

Kenneth M. Suggs (Fed. I.D. 3422)
JANET JENNER & SUGGS, LLC
500 Taylor Street, Suite 301
Columbia, SC 29201
(803) 726-0050
*ksuggs@myadvocates.com*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____        Caption: _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
### Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ ]    this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

# CERTIFICATE OF SERVICE

I certify that on <u>April 2, 2014</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

J. Ben Alexander
Kenneth N. Shaw
HAYNSWORTH SINKLER BOYD, P.A.
Post Office Box 2048
Greenville, South Carolina  29602

Andrew F. Lindemann
William H. Davidson, II
DAVIDSON & LINDEMANN, P.A.
Post Office Box 8568
Columbia, South Carolina  29202

Robert H. Hood
Barbara Wynn Showers
Deborah Harrison Sheffield, Of Counsel
HOOD LAW FIRM, LLC
172 Meeting Street
Post Office Box 1508
Charleston, South Carolina  29402

<u>/s/ Kristi L. Graunke</u>
Signature

<u>April      2, 2014</u>
Date

Reset Form     Print Form     Save Form